JEFFREY I. KOHN
O'MELVENY & MYERS LLP
7 Times Square
New York, NY 10036
Telephone (212) 326-2000
Facsimile: (212) 326-2061

*Attorneys for Plaintiff Fusion Multisystems, Inc., d/b/a Fusion-io*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| FUSION MULTISYSTEMS, INC. d/b/a FUSION-IO,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>DONALD G. BASILE,<br><br>　　　　Defendant. | Case No.<br><br>**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION TO COMPEL** |

# TABLE OF CONTENTS

Page

INTRODUCTION AND FACTUAL BACKGROUND ................................................................ 1

ARGUMENT .................................................................................................................................. 8
    Request No. 1 ..................................................................................................................... 10
    Request No. 2 ..................................................................................................................... 12
    Request No. 3 ..................................................................................................................... 12
    Request No. 5 ..................................................................................................................... 13
    Request No. 6 ..................................................................................................................... 14
    Request No. 7 ..................................................................................................................... 15

CONCLUSION ............................................................................................................................. 16

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Ford Motor Credit Co. v. Meehan*,
2008 WL 2746373 (E.D.N.Y. July 11, 2008) ........................................................... 10

*Horace Mann Ins. Co. v. Nationwide Mut. Ins. Co.*,
240 F.R.D. 44 (D. Conn. 2007) .................................................................................. 10

*Jackson v. Brinker*,
147 F.R.D. 189 (S.D. Ind. 1993) ................................................................................ 10

*Oppenheimer Fund, Inc. v. Sanders*,
437 U.S. 340 (1978) .................................................................................................. 10

*PepsiCo, Inc. v. Redmond*,
54 F.3d 1262 (7th Cir. 1995). ............................................................................. 13, 17

*Williams v. Blagojevich*,
2008 WL 68680 (N.D. Ill. Jan. 2, 2008) ................................................................... 10

**Statutes**

Fed. R. Civ. P. 45(c)(2)(B)(i) ........................................................................................... 10

Fusion Multisystems, Inc. d/b/a Fusion-io ("Fusion-io"), by and through its undersigned counsel, respectfully files this Memorandum in Support of its Motion to Compel compliance with the subpoena issued to Violin Memory, Inc. ("Violin") for the production of information, documents, and tangible things.

## INTRODUCTION AND FACTUAL BACKGROUND

Fusion-io sued Donald G. Basile ("Basile") after Basile took Fusion-io's confidential information and went to work for Violin within weeks of his termination at Fusion-io. When Basile left Fusion-io, he took with him knowledge of Fusion-io's trade secrets, including technical data; the know-how behind Fusion-io's advances; information relating to products, services, software, research, developments, technology, and hardware configuration; marketing plans and strategy; customers and potential customers; investors and potential investors; suppliers; corporate partners; and financial and other business information. Fusion-io and Violin are direct competitors in an emerging and hotly contested segment of the computer memory marketplace. The two companies compete for the same customers, investors, suppliers, and manufacturers. Fusion-io and Violin present their products at the same trade shows and compete for recognition among the same industry trade groups and publications. There is nothing that would be more beneficial to such a direct competitor than access to the trade secret information of its fellow competitor. Violin succumbed to this temptation when Basile approached Violin looking for a way to seek revenge after being terminated for cause as Fusion-io's CEO on February 23, 2009. The next day, Basile was in discussions with Violin about becoming Violin's CEO. Soon thereafter, Violin secretly appointed Basile as CEO without ever publicly acknowledging or announcing such a major move for a relatively small and new company.

1

Fusion-io has sued Basile in the District Court of Utah for misappropriating and disclosing its trade secrets. As part of its discovery efforts, Fusion-io has subpoenaed relevant information from Violin in anticipation of a preliminary injunction hearing, but Violin refuses to fully comply with the subpoena. Violin has unjustifiably delayed the discovery process. Every day that passes further damages Fusion-io, both in its litigation against Basile and in the marketplace. Fusion-io now seeks the Court's assistance.

Fusion-io is a privately-held company that was founded in or about June 2006. Fusion-io is a leading provider of enterprise solid-state technology and high-performance input/output ("I/O") solutions that enable computer systems to access vast amounts of data at extremely quick rates. Fusion-io's solid state devices give customers greatly enhanced performance at a fraction of the cost of traditional disk-based storage systems.[1]

Fusion-io's SSS devices bridge a gap in performance that exists in traditional computer systems when data is transferred between the data storage device and the computer's memory. In a traditional computer system, data is stored on a mechanical hard disk. Unlike a traditional hard disk, an SSS device has no moving parts and is more reliable. It achieves a much higher rate of data transfer than traditional computer systems. The result is that Fusion-io's SSS solutions store massive amounts of data and transfer that data at near-memory speeds. Fusion-io's SSS devices are also more cost effective and environmentally friendly that traditional computer systems.

---

[1] A solid state storage ("SSS") device is a device that stores data for a computer system. A typical SSS device is a collection of NAND flash chips combined with a controller and interface. Flash chips have typically been used in smaller devices such as digital cameras, iPhones, and USB drives. Fusion-io uses Flash chips on a much larger scale. Its devices are primarily used in servers that store large quantities of data.

Fusion-io has many competitors in the SSS market. One of them is Violin. Fusion-io, however, has set itself apart, among other ways, with its unique and proprietary designs and architecture that produce products that write (*i.e.*, store data) as rapidly and efficiently as they read (*i.e.*, access data). The SSS products of Fusion-io's competitors typically write significantly slower than they read. Fusion-io has made a significant investment of time and money in developing its technology.

Although Fusion-io is a relatively new company, it is a rapidly growing and highly successful one. Fusion-io's customer base has grown to include hundreds of large, institutional customers. Fusion-io has sales arrangements with leading computer manufacturers such as I.B.M., Dell, and Hewlett-Packard. Fusion-io's chief scientist is Steve Wozniak, who co-founded Apple with Steve Jobs. As a result of a significant monetary investment and the efforts of highly skilled and experienced employees, Fusion-io has quickly become a market leader in the highly specialized area of enterprise SSS solutions. Fusion-io's intellectual property, including trade secret information, is vital to its continued success.

Defendant Donald G. Basile joined Fusion-io as its Chief Executive Officer on or about February 1, 2008. As CEO of Fusion-io, Basile necessarily was at the forefront of every aspect of Fusion-io's business. Basile had access to all of Fusion-io's technical data. Basile holds a Ph.D. in electrical engineering from Stanford University and understands the technology behind Fusion-io's products. As CEO, Basile was intimately familiar with the confidential business side of the Company as well, including customers, investors, suppliers, pricing, marketing strategy, and product development strategy.

3

Fusion-io and Basile entered into a Proprietary Information and Inventions Assignment Agreement ("PIIA") on or about March 13, 2008. (Declaration of Lance Smith ("Smith Decl") ¶ 4, Exh. B.) The PIIA contains the following provisions that are relevant to this action:

> **Company and Third Party Information.** I agree that at all times during the term of my employment and thereafter, to hold in strictest of confidence, and not to use, except for the benefit of the Company, or to disclose to any person, firm or corporation without written authorization of the Board of Directors of the Company, any Confidential Information of the Company. I understand that "Confidential Information" means any Company proprietary information, technical data, trade secrets or know-how, including, but not limited to, information relating to products, services, software, research, developments, technology, hardware configuration information, marketing, finances or other business information disclosed to me by the Company either directly or indirectly in writing, orally or by drawings or observation of parts or equipment.

(Smith Decl. ¶ 4, Exh. B at ¶ 2(a).)

> **RETURNING COMPANY DOCUMENTS.** I agree that, at the time of leaving the employ of the Company, I will deliver to the Company (and will not keep in my possession, recreate or deliver to anyone else) any and all devices, records, data, notes, materials, equipment, other documents or property, or reproductions of any aforementioned items developed by me pursuant to my employment with the Company or otherwise belonging to the Company, its successors or assigns.

(Smith Decl. ¶ 4, Exh. B at ¶ 5.)

> **SOLICITATION OF EMPLOYEES OR CUSTOMERS.** For a period of twelve (12) months following the date Employee ceases to be employed by the Company for any reason, Employee, directly or indirectly, will not: (i) solicit, induce, influence or encourage any person to leave employment with the Company or its resellers or distributors or (ii) harass or disparage the Company or its employees, clients, directors or agents. For a period of twelve (12) months following the date Employee ceases to be employed by the Company for any reason, Employee, directly or indirectly, will not solicit any of the Company's customers or users who were customers or users at any time during Employee's employment with the Company.

(Smith Decl. ¶ 4, Exh. B at ¶ 6.)

On or about December 31, 2008, Fusion-io and Basile entered into the Amended Employment Agreement, which provides further protections for the company's Confidential Information. (Smith Decl. ¶ 5, Exh. C.) The Amended Employment Agreement contains the following provisions that are relevant to this action:

4

**NONSOLICITATION/NONDISPARAGEMENT.** In the event of the termination of Executive's employment for any reason, Executive shall not, for a period of twelve (12) months, directly or indirectly:

(a) solicit, induce or encourage any employee of the Company or any of its affiliates or subsidiaries to terminate their employment with the Company or any of its affiliates or subsidiaries;

(b) make any derogatory public statement concerning the financial performance, products, services, the Board or management personnel of the Company or any of its affiliates or subsidiaries, or Executive's employment; or

(c) use or disclose the Company's Confidential Information to induce, attempt to induce or knowingly encourage any Customer of the Company or any of its affiliates or subsidiaries to divert any business or income from the Company or any of its affiliates or subsidiaries, or to stop or alter the manner in which they are then doing business with the Company or any of its affiliates or subsidiaries.

(Smith Decl. ¶ 5, Exh. C at ¶ 10.)

On February 23, 2009, Fusion-io's Board of Directors met with Basile and terminated his employment for cause, effective as of the same day. Fusion-io has subsequently learned that the very next morning, on February 24, Basile contacted Violin in an effort to secretly become its CEO. Prior to February 24th, Basile had no prior communications with Violin and his only apparent knowledge of Violin was that it was a primary competitor of Fusion-io. Nonetheless, within days after his employment ended at Fusion-io, Basile scheduled a visit to Violin's offices in New Jersey to discuss "engineering costs", "the memory pricing [Violin is] getting and how [Basile] can work out how Violin can improve that," and Violin's "current forecast, development plan, current and projected costs and related items." Basile attended this meeting the following week, began performing consulting services shortly thereafter and negotiated the terms of his employment. (Confidential Declaration of Scott S. Bell, Filed Under Seal ("Confidential Bell Decl.") ¶ 4, Exh. B.) He officially became Violin's CEO on April 15, but the move was kept secret and Violin assured Basile that it would instruct its employees not to share this information with any outside third party. (Confidential Bell Decl. ¶ 5, Exh. C.) To this day, Violin has not

5

publicly announced that it has hired Basile as CEO, and it does not acknowledge Basile's role with the company on its Web site. Instead, on April 9, 2009, Basile publicly announced that he was hired as a Managing Director of Iron Capital Partners, an investment firm that is currently an investor of Fusion-io.

On or about April 16, 2009, Fusion-io received an e-mail that was apparently sent to it inadvertently. In the e-mail, a business consultant who was under contract with Fusion-io had an exchange of e-mails with an executive at a venture capital firm. In that exchange of e-mails, the consultant explained that he was about to become the Chairman of the Board of Directors of Violin and that Basile is the "new CEO." The consultant further informed the potential investor that Violin was "repositioned" as a "Network Attached Solid State System company," which he contrasted with its prior business of being an "old DRAM vendor." (Smith Decl. ¶ 3, Exh. A.) That change made Violin a direct competitor of Fusion-io, which markets network attached storage systems using SSS devices that provide vastly superior performance to DRAM devices.

Fusion-io further discovered that, while Basile was still employed by Fusion-io, he caused all of his e-mails to be forwarded from his Fusion-io e-mail account to his own personal e-mail account, and purposefully directed that they not be stored on Fusion-io's servers. Thus, when Basile left Fusion-io, he was in possession of electronic and/or physical documents containing Fusion-io's proprietary, trade secret information, and Fusion-io was left without access to the information Basile took with him. Basile was still in possession of that information at the time he negotiated with and joined Violin. He only provided copies of the e-mails and documents to Fusion-io after the Utah federal district court ordered him to do so on May 18, 2009. (Declaration of Scott S. Bell ("Bell Decl.") ¶ 7, Exh. E.) To this day, Basile retains copies

6

of the e-mails and documents, although the Court has ordered him not to use the information on behalf of Violin or for any purposes other than pursuing his claims and defenses against Fusion-io.

When Basile left Fusion-io, he was also in possession of one of only two ioSAN Prototype Cards developed by Fusion-io. "SAN" stands for Storage Array Network, which in general terms is a network of large disk arrays (in this case, any number of Fusion-io SSS devices). ioSAN is Fusion-io's branded and proprietary SAN card. The ioSAN Prototype Card in Basile's possession is a next-generation product being developed by Fusion-io, and it is not yet on the market. Basile's counsel initially challenged the proprietary nature of the ioSAN, arguing on the record about the worth and content of an ioSAN prototype that is not publicly available. At a later hearing, Basile's counsel changed the story and argued that Basile was not in possession of an ioSAN prototype.

On May 8, 2009, Fusion-io filed a lawsuit against Basile. Fusion-io sued Basile for (i) misappropriation of trade secrets and disclosure of trade secrets to Violin, (ii) conversion; (iii) breach of fiduciary duty and duty of loyalty; and (iv) violation of the Computer Fraud and Abuse Act. Fusion-io requested injunctive relief ordering Basile to, among other things: (i) terminate his employment with Violin; (ii) return Fusion-io's information and property in his possession to Fusion-io; and (iii) honor his contractual obligations not to disclose Fusion-io's confidential information, not to solicit Fusion-io's employees, and not to solicit Fusion-io's customers. Fusion-io also requested damages for Basile's actions.

Shortly after the case began, the Court authorized the parties to engage in discovery. As part of its discovery efforts, Fusion-io sent a subpoena dated June 8, 2009 to Violin requesting

seven categories of documents, electronically stored information, or tangible things. (Bell Decl. ¶ 3, Exh. A.) As a condition for producing documents, Violin required Fusion-io and Basile to agree to a protective order, and the parties did so. (Confidential Bell Decl. ¶ 3, Exh. A.) Violin responded to the subpoena on June 17, 2009. (Bell Decl. ¶ 4, Exh. B.) Simultaneous with its written response, Violin produced 203 pages of documents. In its written responses, Violin agreed to produce documents in response to only three of Fusion-io's seven requests. Even Violin's positive responses were qualified by a number of objections.

On July 10, 2009, Fusion-io's counsel sent a letter to Violin's counsel raising several issues regarding Violin's production and objections. (Bell Decl. ¶ 5, Exh. C.) In the letter, Fusion-io's counsel pointed out a number of shortcomings in Violin's production and improper objections and requested that Violin supplement its production.

On July 23, 2009, Violin's counsel responded to the letter from Fusion-io's counsel. (Bell Decl. ¶ 5, Exh. D.) Violin refused to produce any additional documents. Violin's counsel dismissed each of the issues raised by Fusion-io's counsel, and did not agree to re-consider any objections or produce any additional documents.

## ARGUMENT

The Court should compel Violin to produce all of the documents and electronically stored information requested by Fusion-io. If a person commanded to make a production by a subpoena objects, "the serving party may move the issuing court for an order compelling production or inspection." Fed. R. Civ. P. 45(c)(2)(B)(i). The scope of material obtainable by a subpoena is as broad as permitted under the discovery rules. *Jackson v. Brinker*, 147 F.R.D. 189, 193-94 (S.D. Ind. 1993). The threshold for obtaining information and materials under the Federal Rules of

Civil Procedure is extremely low. *See Horace Mann Ins. Co. v. Nationwide Mut. Ins. Co.*, 240 F.R.D. 44, 48 (D. Conn. 2007) (referring to the "Lilliputian threshold of relevance" for discovery). A subpoena seeks relevant information as long as the information "bears on, or … reasonably could lead to other material that could bear on any issue that is or may be in the case." *Ford Motor Credit Co. v. Meehan*, 2008 WL 2746373, *4 (E.D.N.Y. July 11, 2008) (unpublished) (quoting *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978)). A party opposing a subpoena has the burden of showing that it is overly broad, unduly burdensome, or not relevant. *Williams v. Blagojevich*, 2008 WL 68680, *3 (N.D. Ill. Jan. 2, 2008) (unpublished). To meet this burden, the party opposing the subpoena must specifically detail why a request is irrelevant, overly broad, or otherwise objectionable. *See id.*

Fusion-io has requested from Violin information that is relevant and critical to its claims against Basile. While Violin has produced some documents in response, it has failed and refused to produce a substantial amount of information and documents. As an initial matter, Violin appears to base its refusal to produce additional documents on its subjective (and incorrect) opinion of the merits of Fusion-io's claims against Basile. Violin's counsel termed Fusion-io's claims as "narrow allegations against Mr. Basile." Violin's counsel further stated: "Fusion-io cannot (and will not be permitted to) use its seemingly groundless litigation against Mr. Basile as a vehicle to obtain access to Violin's confidential and proprietary intellectual property and current business and financial strategies." (Bell Decl. ¶ 6, Exh. D.) Violin's self-serving characterizations of the merits of Fusion-io's claims have no bearing on Violin's responsibility to fully comply with the subpoena. Moreover, it is somewhat ironic that Violin—a company that was in discussions with the former CEO of its direct competitor on the day after he was

9

terminated—is accusing Fusion-io of seeking access to its intellectual property. Any concerns about Violin's intellectual property have been obviated by a protective order that Violin drafted and to which Fusion-io agreed. Violin's opinion about the merits of Fusion-io's claims is irrelevant and is an improper ground for withholding documents.

Below, Fusion-io will explain the shortcomings of Violin's response to each of Fusion-io's requests and the impropriety of Violin's objections.

**Request No. 1**

Request No. 1 calls for documents or electronically stored information "relating to any and all communications between Violin and Basile from February 1, 2008, through the present." (Bell Decl. ¶ 3, Exh. A.) In response, Violin asserted multiple objections, but still agreed to produce responsive documents. (Bell Decl. ¶ 4, Exh. B.) The communications produced by Violin, however, almost all occurred prior to Basile becoming Violin's CEO. Violin produced almost no communications between Basile and his co-workers after Basile began his employment at Violin.[2] Basile is a man who communicates extensively, and sometimes almost exclusively, by e-mail, as Fusion-io well knows from Basile's time as Fusion-io's CEO.[3] It is extremely likely that he has communicated extensively with Violin employees via e-mail. Notably, even in refusing to produce more e-mails, Violin has been careful not to represent that it does not possess more e-mails to and from Basile.

---

[2] The fact that Violin produced some documents in response to Request No. 1 is evidence, in and of itself, that Violin has acted improperly in withholding other documents. Violin did not qualify its production by stating that it would only produce a certain category of responsive documents. Violin has acknowledged that Request No. 1 is a legitimate request and that Violin has responsive documents. The Court should compel Violin to produce the remainder of its responsive documents.

[3] Indeed, when Basile finally returned certain Fusion-io e-mails after being ordered to do so by the Utah federal district court, he returned nearly 24,000 documents and more than 100,000 pages of e-mails. This is in addition to the emails and documents that Basile selectively deleted from his computers and e-mail accounts during the weeks after his employment ended with Fusion-io.

As explained above, Basile was terminated as Fusion-io's CEO on February 23, 2009. The next day, he was in communication with Violin, a direct competitor, about performing the same exact function for Violin. During the following two weeks, Basile met with Violin executives to discuss some of the very subjects that are the utmost importance to Fusion -- memory pricing, engineering costs, securing financing, and product development. Within two months, he secretly became Violin's CEO. All the while, Basile was in possession of Fusion-io's confidential and trade secret information and the ioSAN prototype which he has never returned. Basile's knowledge of Fusion-io's technology, customers, investors, suppliers, pricing, marketing strategy, and product development strategy—and his disclosure and use of such information on behalf of Violin—is at the center of Fusion-io's claims against Basile. Fusion-io is entitled to discover precisely what Basile has communicated to Violin, and how and when he did so.

When Fusion-io raised this issue with Violin, the primary response by Violin's counsel was the assertion that "Violin has no documents which contain trade secrets allegedly misappropriated from Fusion-io by Mr. Basile." This type of response is insufficient and demonstrates precisely why Fusion-io cannot narrow its request. It is in both Violin's and Basile's self-interest to claim that Violin has not received any of Fusion-io's trade secrets from Basile. Fusion-io is not required to take their word for it. Rather, Fusion-io is entitled to pursue relevant discovery supporting its claims. Fusion-io is in the best position to analyze the information conveyed by Basile to Violin and determine when Basile has disclosed trade secrets.

One of Fusion-io's arguments is that it is inevitable that Basile has disclosed Fusion-io's trade secrets, given his intimate knowledge of Fusion-io's trade secrets, the fact that Violin and

11

Fusion-io are direct competitors, and the fact that Basile has nearly identical job duties at Violin as he had at Fusion-io. *See PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1269-70 (7th Cir. 1995). Under this doctrine, it is impossible for Basile to fulfill his role at Violin without disclosing Fusion-io's trade secrets. Certainly, Fusion-io may obtain discovery supporting this claim.

Based on Fusion-io's claims against Basile (in addition to the suspicious circumstances of Basile's employment with Violin), all of Violin's communications with Basile are relevant. The Court should order Violin to produce them.

**Request No. 2**

Request No. 2 calls for "internal documents or electronically stored information relating or referring to Basile, including but not limited to memoranda, Board minutes, and internal emails, from February 1, 2008 to present." (Bell Decl. ¶ 3, Exh. A.) In response, Violin asserted multiple objections, but still agreed to produce responsive documents. (Bell Decl. ¶ 4, Exh. B.) Similar to its response to Request No. 1, Violin produced almost no internal documents relating or referring to Basile after Basile began his employment at Violin. Again, it appears dubious that Violin has no internal documents relating to Basile since the time of his hiring, and Violin has been careful not to represent that no such documents exist. Such internal documents would likely discuss Basile's contributions to Violin and information he has shared with the company. This information is highly relevant to Fusion-io's claims against Basile, and the Court should order Violin to produce it.

**Request No. 3**

Request No. 3 calls for "documents, electronically stored information, physical items—including but not limited to any solid state storage products or prototypes—or electronic devices

12

received from Basile from February 1, 2008 to present." (Bell Decl. ¶ 3, Exh. A.) In response, Violin asserted several objections and represented "that it does not possess, and has not possessed, 'any solid state storage products or prototypes—or electronic devices received from Basile from February 1, 2008 to present." (Bell Decl. ¶ 4, Exh. B.) The problem with this response is that it ignores much of the request. Request No. 3 also seeks documents, electronically stored information, and physical items. Fusion-io pointed this out to Violin, and Violin responded by stating that it does not possess physical items received from Basile. (Bell Decl. ¶ 5, Exh. C.) Thus, after two attempts, Violin still has not addressed, or produced, documents and electronically stored information it has received from Basile. This is an easy-to-understand and relevant request. The Court should order Violin to produce all responsive documents and information.

**Request No. 5**

Request No. 5 calls for documents or electronically stored information "relating to communications between [Violin] and customers of Fusion-io from February 23, 2009, through the present." (Bell Decl. ¶ 3, Exh. A.) Violin refused to produce any documents or information in response to this request. Violin objected that the request is vague, is ambiguous, lacks particular, assumes facts not in evidence, and seeks irrelevant information. (Bell Decl. ¶ 4, Exh. B.) Most of Violin's objections appear based on its position that it does not understand the term "customers." When Fusion-io pressed Violin on this point, Violin's counsel responded that "absent more specific information concerning the identity of Fusion-io customers at issue, Violin cannot, and will not, guess or speculate what entities are, or are not, 'customers of Fusion-io.'" (Bell Decl. ¶ 6, Exh. D.)

13

Violin's purported failure to understand the commonly used term "customer" is not credible. The term is universally understood to mean persons or entities that have purchased products or services from Fusion-io. Further, as Fusion-io explained in its letter to Violin, the request is obviously limited by the extent of Violin's knowledge, as with all discovery requests. Violin should produce its communications with persons or entities that it knows or understands to be customers or Fusion-io. Certainly, Violin's new CEO should be able to help in identifying (without disclosing Fusion-io's trade secrets) what communications from Violin went to Fusion-io customers.

The requested information is relevant because Basile has contracts which obligate him not to solicit Fusion-io customers and not to use Fusion-io's confidential information in attempts to divert business away from Fusion-io. Fusion-io alleges that Basile has not honored these provisions. Any communications Violin has had with Fusion-io's customers during the period that Basile was either in negotiations with Violin or acting as Violin's CEO are relevant to these claims. Again, this is an easy-to-understand and relevant request, and the Court should order Violin to produce all responsive documents and information.

**Request No. 6**

Request No. 6 calls for documents or electronically stored information "relating to communications between you and employees, representatives, or agents of Fusion-io from February 23, 2009, through the present." (Bell Decl. ¶ 3, Exh. A.) Violin responded with the identical objections it asserted in response to Request No. 5 and again refused to produce documents or information in response. (Bell Decl. ¶ 4, Exh. B.) Most of Violin's objections appear based on its position that it does not understand the phrase "employees, agents, or

representatives." Similar to "customers," these are commonly understood words that do no require further definition. Basile is under a contractual obligation not to solicit Fusion-io employees, yet two former Fusion-io employees (Matt Barletta and Dixon Doll, Jr.) have now joined Violin, in addition to Basile. Certainly, Violin's communications with these individuals, along with any other Fusion-io employees, are relevant, and the Court should require Violin to produce them.

**Request No. 7**

Request No. 7 calls for documents or electronically stored information "relating to Fusion-io or any of its products, including but not limited to the ioSAN or the ioDrive from February 1, 2008 to present." (Bell Decl. ¶ 3, Exh. A.) In response, Violin asserted several objections and represented that "it does not possess, and has not possessed, any non-public documents or information concerning the 'ioSAN or the ioDrive.'" (Bell Decl. ¶ 4, Exh. B.) Violin later represented that it "does not possess non-public documents or information concerning Fusion-io." (Bell Decl. ¶ 6, Exh. D.) This response fails to properly address Fusion-io's request. Fusion-io did not limit its request to non-public information. Violin's status as a direct competitor of Fusion-io is relevant to Fusion-io's claim that Basile inevitably has disclosed and will disclose Fusion-io's trade secrets to Violin. A key factor in the doctrine of inevitable disclosure is the status of the new employer competing in the same space as the prior employer. *See PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1270-71 (7th Cir. 1995). Any information in Violin's possession regarding Fusion-io, public or not, is relevant to Violin's status as a competitor of Fusion-io and should be produced.

## CONCLUSION

For the foregoing reasons, the Court should grant Fusion-io's Motion and order Violin to produce all documents responsive to the subpoena served by Fusion-io.

DATED this 11th day of September, 2009.

O'MELVENY & MYERS LLP

By: _____
Jeffrey I. Kohn
Times Square Tower
7 Times Square
New York, New York 10036
jkohn@omm.com

Attorneys for Plaintiff
